**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION**

| | | |
|---|---|---|
| QUENTAVIOUS BURELL EVANS, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CASE NO.: 1:23-CV-107 (LAG) |
| | : | |
| CMFG LIFE INSURANCE COMPANY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

# ORDER

Before the Court is Defendant's Motion to Strike Plaintiff's Untimely Cross-Motion for Summary Judgment and Memorandum in Support Thereof (Doc. 22), Plaintiff's Cross-Motion for Summary Judgment (Doc. 20), Plaintiff's Motion in Limine to Exclude Portions of Lith Abella's Declaration (Doc. 18), and Defendant CMFG Life Insurance Company's Motion for Summary Judgment and Memorandum in Support (Doc. 15). For the reasons below, Defendant's Motion to Strike (Doc. 20) is **GRANTED**, and, accordingly, the Court **STRIKES** Plaintiff's Cross-Motion for Summary Judgment (Doc. 20). Furthermore, Plaintiff's Motion in Limine (Doc. 18) is **DENIED** and Defendant's Motion for Summary Judgment (Doc. 15) is **DENIED in part** and **GRANTED in part**.

## BACKGROUND

This case concerns whether Defendant breached its insurance contract with Wanda Evans, the decedent, when it denied her son's, Plaintiff Quentavious Evans', claim for benefits after her death.[1] On July 21, 2021, the decedent applied for a $70,000 Term Life to Age 80 Policy (the Policy) offered by Defendant. (Doc. 15-1 ¶ 1; Doc. 19-1 ¶ 1; Doc.

---

[1] The relevant facts are derived from the Parties' Statements of Material Facts, responses thereto, and the record in this case. (*See* Docs. 15-1, 19-1, 19-2). When evaluating the Motions for Summary Judgment, the Court "view[s] the facts in the light most favorable to the nonmoving party on each motion." *James River Ins. v. Ultratec Special Effects Inc.*, 22 F.4th 1246, 1251 (11th Cir. 2022) (citing *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012)).

15-3). The application required the applicant to answer two questions about her health. (*See* Doc. 15-3 at 26). First, it asked: "Are you unable to work or perform normal activities due to a chronic illness or permanent injury?" (*Id.*). The decedent responded, "Yes." (*Id*). Second, the application asked: "Have you, within the past 5 years, been treated for or diagnosed by a medical professional with the following" and listed twelve medical conditions, including "Chronic Depression" and "Mental Disorder[.]" (*Id.*). The decedent responded, "No." (*Id.*). At the end of the application, the decedent affirmed that "all [her] statements and answers [we]re true to the best of [her] knowledge and belief[,]" and that she "underst[oo]d that . . . benefits may be denied during the first 2 years from the effective date if [she] fail[ed] to give true and complete answers in th[e] application[.]" (*Id.* at 27). On July 12, 2021, Defendant issued the decedent the Policy based on her representations in the application. (Doc. 15-1 ¶ 8; Doc. 19-1 ¶ 8). Plaintiff Quentavious Evans, the decedent's son, was named the beneficiary of the Policy. (Doc. 15-1 ¶ 10; Doc. 19-1 ¶ 10).

Wanda Evans died on October 11, 2022, and Defendant was notified of her death the next day. (Doc. 15-1 ¶ 9; Doc. 19-1 ¶ 9; Doc. 15-5). Plaintiff filed a claim for benefits and provided Defendant with claim documentation, including the decedent's death certificate in November of 2022. (Doc. 15-1 ¶ 10; Doc. 19-1 ¶ 10; Doc. 15-5). Defendant investigated the claim and obtained and reviewed the decedent's medical records from East Albany Medical Center. (Doc. 15-1 ¶¶ 11–12; Doc. 19-1 ¶¶ 11–12). Upon review of the medical records, Defendant learned that the decedent had been treated for depression. (Doc. 15-1 ¶ 11; Doc. 19-1 ¶ 11).

The medical records show two visits to East Albany Medical Center in 2019 and one visit in 2021. (Doc. 15-1 ¶¶ 13–25; Doc. 19-1 ¶¶ 13–25). The decedent first visited East Albany Medical Center on May 9, 2019. (Doc. 15-1 ¶ 13; Doc. 19-1 ¶ 13). The doctor's notes describe the reason for the visit as "Est. Care/Knee Pain, medication for depression." (Doc. 15-9 at 13). The notes explain that the decedent had been "[d]epressed for x years" but had "never seen a provider." (*Id.*). At this visit, the doctor conducted a depression screening and determined that the decedent had a "Moderate episode of recurrent major depressive disorder." (*Id.* at 14; Doc. 15-1 ¶ 14; Doc. 19-1 ¶ 14). The

2

decedent reported her mood during the appointment as "Depressed, Tearful." (Doc. 15-9 at 11; Doc. 15-1 ¶ 17; Doc. 19-1 ¶ 17). A social worker recommended counseling, but the decedent refused. (Doc. 15-1 ¶ 16; Doc. 19-1 ¶ 16). The doctor prescribed the decedent Zoloft as treatment for the depression and recommended that she follow up with the doctor in four weeks regarding her "knee pain" and "depression." (Doc. 15-1 ¶¶ 18–19; Doc. 19-1 ¶¶ 18–19). The decedent returned to East Albany Medical Center for a follow-up on June 6, 2019. (Doc. 15-1 ¶ 20; Doc. 19-1 ¶ 20). At this appointment, she "admit[ed] a depressed mood" and received a refill of the Zoloft prescription but also improved her score on the depression screening questionnaire. (Doc. 15-9 at 7–8; Doc. 15-1 ¶ 20; Doc. 19-1 ¶ 20). She declined a referral to a behavioral health specialist. (Doc. 15-1 ¶ 21; Doc. 19-1 ¶ 21).

Almost two years later, on March 3, 2021, the decedent had a telehealth appointment with East Albany Medical Center. (Doc. 15-1 ¶ 21; Doc. 19-1 ¶ 21). The doctor's notes state that she was "continuing to have problems with her knee/Depression." (Doc. 15-9 at 5). The decedent requested medication for knee pain and a refill of Zoloft. (*Id.*). The doctor's notes further state that "Patient has been without Zoloft for over a year. Patient admits to depression." (*Id.*). The notes describe the decedent as having "recurrent major depressive disorder[.]" (*Id.*). Defendant also requested records from a different medical facility, but it declined to provide them. (Doc. 15-1 ¶ 30; Doc. 19-1 ¶ 30). After the litigation began, Defendant obtained medical records from Phoebe Family Albany & Rheumatology from October 2022, which state that the decedent had depressive disorder. (Doc. 15-16 at 3).

During the investigation of Plaintiff's claim, Defendant conferred with nurse consultant Lith Abella regarding the East Albany Medical Center medical records. (Doc. 15-1 ¶ 26; Doc. 19-1 ¶ 26; Doc. 15-17). In an email to Defendant regarding Plaintiff's claims, Abella summarized the decedent's condition as follows: "Problem list: moderate episode of recurrent major depressive disorder (5/9/2019) Medication Zoloft (for depression)." (Doc. 15-10 at 3). In her declaration, Abella states that she determined through her review of the medical records that the decedent should have "yes" to Question 2 on the application and checked the boxes for "Chronic Depression" and "Mental

3

Disorder." (Doc. 15-17 ¶¶ 3–6; Doc. 15-1 ¶ 26). According to Defendant, it would not have issued the Policy to the decedent had she answered "yes" to Question 2 and stated that she had a history of "Chronic Depression" or a "Mental Disorder." (Doc. 15-1 ¶ 28; Doc. 15-2 ¶ 15). Specifically, Katie Tiedt, a Staff Underwriter, declared: "The presence of Chronic Depression or Mental Disorder alone would not disqualify an applicant from obtaining coverage. However, a yes to answer to Question # 1[,]" which asks whether Defendant in unable to work due to a chronic illness, "in combination with a diagnosis of, or treatment for, Chronic Depression or Mental Disorder within five years of the date of the application would result in a denial of the request for coverage." (Doc. 15-18 ¶ 5).

Defendant determined that the decedent had misrepresented her medical history on the application and denied Plaintiff's claim on this basis. (Doc. 15-12). Defendant sent a letter to Plaintiff on December 30, 2022, notifying him of the denial. (Doc. 15-12; Doc. 15-1 ¶ 32; Doc. 19-1 ¶ 32). Therein, Defendant explained that "because [the decedent] answered 'no' to [Question 2] on the application, the answer did not accurately reflect her insurability; therefore, death proceeds are not available to this misrepresentation." (Doc. 15-12; Doc. 15-1 ¶ 32; Doc. 19-1 ¶ 32). The letter also stated that "[a] $825.00 refund of all premiums paid is being sent under separate cover." (Doc. 15-12). Defendant sent the premium refund check the same day. (Doc. 15-1 ¶ 32; Doc. 19-1 ¶ 32).

On January 4, 2023, Plaintiff called Defendant regarding his claim and was told that the claim had been denied and that a denial letter and check had been sent to him. (Doc. 19-8 ¶ 7). Thereafter, Plaintiff received the letter and check. (*Id.* ¶¶ 8–9). When he received the check, he cashed it. (Doc. 15-1 ¶ 33; Doc. 19-1 ¶ 33). In his declaration, Plaintiff states that he "never had any agreement with [Defendant] that the $825 check [Defendant] mailed [him] would be full payment for [his] claim" and "never considered the . . . check . . . to be payment for [his] claim." (Doc. 19-8 ¶¶ 11–12). On April 5, 2023, Plaintiff's attorney sent Defendant a demand letter demanding that Defendant pay Plaintiff's claim within sixty days. (Doc. 15-1 ¶ 34; Doc. 19-1 ¶ 34). On May 19, 2022, Plaintiff's attorney spoke on the phone with one of Defendant's employees. (Doc. 15-1 ¶ 35; Doc. 19-1 ¶ 35). According to Defendant, the employee asked for additional medical information, which Plaintiff never

4

provided. (Doc. 15-1 ¶¶ 35–36). Plaintiff's attorney declares that the employee indicated that Defendant's "position of denial would not change unless [Defendant] received medical information stating that [the decedent] was not treated for major depressive disorder[,]" which "was impossible since no information existed." (Doc. 19-11 ¶¶ 5–6).

Plaintiff filed this lawsuit in the Superior Court of Dougherty County on June 6, 2023. (Doc. 1-1 at 10–18). In the Complaint, Plaintiff brings claims for breach of contract, attorneys fees and expenses, and bad faith damages pursuant to O.C.G.A. § 33-4-6. (*Id.* at 15–17). Defendant timely removed the case to federal court on July 13, 2023. (Doc. 1). On March 28, 2024, Defendant filed a Motion for Summary Judgment. (Doc. 15). Plaintiff sought and was granted an extension of time to file the response. (Docs. 16, 17). On May 2, 2024, Plaintiff filed Plaintiff's Response to Defendant's Motion for Summary Judgment, Cross-Motion for Summary Judgment on Defendant's Defense of Accord and Satisfaction, and Supporting Memorandum. (Docs. 19–20). The same day, Plaintiff also filed a Motion in Limine to Exclude Portions of Lith Abella's Declaration. (Docs. 18). Defendant filed a Reply to Plaintiff's Response to the Motion for Summary Judgment and a Motion to Strike Plaintiff's Untimely Motion for Summary Judgment and Memorandum in Support Thereof on May 16, 2024. (Doc. 22). Defendant responded to the Motion in Limine on May 23, 2024. (Doc. 23). Plaintiff responded to the Motion to Strike on May 28, 2024. (Doc. 24). Defendant replied on June 11, 2024. (Doc. 25). Thus, the motions are ripe for review. *See* M.D. Ga. L.R. 7.3.1(A).

**DEFENDANT'S MOTION TO STRIKE**

Defendant moves to strike Plaintiff's Cross Motion for Summary Judgment as untimely. (*See* Docs. 20, 22). Pursuant to the Court's Scheduling and Discovery Order, dispositive motions were due on March 7, 2024. (Doc. 6 ¶ 6). The Court granted an extension to the Parties to file dispositive motions through and including March 28, 2024. (Doc. 14). Defendant filed a Motion for Summary Judgment on March 28, 2024. (Doc. 15). The Parties filed a joint motion requesting an extension time for Plaintiff to file a *response* to the Motion for Summary Judgment through May 2, 2024, and the Court granted the motion. (Docs. 16, 17). The Court's Order granting Plaintiff an extension of time to file a

5

response to Defendant's Motion for Summary Judgment did not extend the deadline for Plaintiff to file a dispositive motion. (*See* Doc. 17). Plaintiff filed its Cross-Motion for Summary Judgment on May 2, 2024, thirty-five days after the dispositive motions deadline. (*See* Docs. 16, 17, 20). Plaintiff's Cross-Motion for Summary Judgment was untimely, and "[d]istrict [c]ourts 'enjoy broad discretion in deciding how to best manage the cases before them' . . . [including] whether to consider untimely motions for summary judgment[.]" *Enwonwu v. Fulton-Dekalb Hosp. Auth.*, 286 F. App'x 586, 595 (11th Cir. 2008) (per curiam) (first quoting *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997); and then citing *Matia v. Carpet Transport, Inc.*, 888 F.2d 118, 119 (11th Cir. 1989)). Upon due consideration, the Court declines to consider Plaintiff's Cross-Motion for Summary Judgment. (Doc. 20).

## PLAINTIFF'S MOTION IN LIMINE

Plaintiff filed a Motion in Limine seeking to exclude portions of the Declaration of Lith Abella that he argues are expert opinion testimony. (Doc. 18 at 1). In the Declaration, Abella explains that Defendant consulted her as part of the investigation regarding Plaintiff's claim for benefits. (Doc. 15-17 ¶ 3). She explains that "the purpose of [her] review was to determine, among other things, whether the medical records indicated treatment or diagnosis of one or more of the twelve medical conditions identified on the application." (*Id.* ¶ 4). She states that based on the information in the medical records she "concluded that the Insured was treated for and/or diagnosed by a medical professional for 'Chronic Depression' and 'Mental Disorder.'" (*Id.* ¶ 6). Defendant explains that it relied on Abella's review to determine that Plaintiff misrepresented her medical history on the application and, thus, to rescind the policy. (Doc. 15-1 ¶¶ 26–29).

Plaintiff seeks to strike the declaration, arguing that Defendant presents Abella's Declaration as an expert opinion that the decedent had been diagnosed with a "Mental Disorder" or "Chronic Depression," and that Defendant did not disclose Lith Abella as an expert. (Doc. 18 at 3–5). In response, Defendant argues that Abella is a lay witness with knowledge of the underlying facts of the case and that it properly disclosed her as a lay witness. (Doc. 23 at 5–8).

First, Plaintiff's Motion in Limine is untimely. Motions to exclude expert testimony relevant to a motion for summary judgment were due on March 28, 2024, and Plaintiff did not file the motion until May 2, 2024. (*See* Docs. 6, 14, 18). Second, Abella is a fact witness permitted to testify regarding her personal knowledge of the work she performed for Defendant in the claims investigation process. (*See* Doc. 15-17 ¶¶ 4–6); *see* Fed. R. Evid. 701; *see also Tardiff v. Geico Indem. Co.*, 481 F. App'x 584, 587 (11th Cir. 2012) (affirming district court's ruling permitting insurance company attorney and claims adjuster to "testif[y] as [a] fact witness[] . . . [where they] confined their testimony to statements based on their own experiences and personal knowledge."). Abella offers evidence regarding her review of the decedent's medical records at the request of Defendant during the insurance company's claim review process, which occurred before this litigation began. (*See* Doc. 15-17). She describes her personal knowledge of the investigation into Plaintiff's claim and the conclusion that she provided to Defendant after review of the decedent's medical records. (*Id.* ¶¶ 4–6). Abella does not offer an opinion as to whether Plaintiff's claim properly was denied; rather her testimony and the email go only to what she did and determined during the course of her review. (*See id.*). Accordingly, her declaration does not constitute expert testimony, and there is no basis to strike it.

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I.   Legal Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate where "the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (citation omitted). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to

find for the nonmoving party." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1311 (11th Cir. 2018) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004)). At summary judgment, the Court views the evidence "in the light most favorable to the non-moving party" and resolves factual disputes for the nonmoving party when doing so is supported by sufficient evidence. *Gogel*, 967 F.3d at 1134 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007)); *Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1328 (11th Cir. 2020).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018); *Whitehead*, 979 F.3d at 1328. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013) (per curiam). If the movant meets their initial burden, the nonmoving party must demonstrate that there is a genuine dispute for trial. *Gogel*, 967 F.3d at 1134 (citing *Celotex Corp.*, 447 U.S. at 324). The nonmovant must "go beyond the pleadings and . . . present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 557 (11th Cir. 2014) (per curiam) (first citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); and then citing *Celotex Corp.*, 477 U.S. at 324). "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56; *see Mason v. George*, 24 F. Supp. 3d 1254, 1260 (M.D. Ga. 2014).

**II.   Discussion**

Defendant seeks summary judgment as to all of Plaintiff's claims. (*See* Doc. 15). As to the breach of contract claim, Defendant argues that the decedent's failure to disclose her background with depression constituted a misrepresentation that warranted recission of

8

the contract and that the check Plaintiff cashed constituted accord and satisfaction with regard to any claim he had under the Policy. (*Id.* at 9–18). As to Plaintiff's bad faith claim, Defendant argues that it reasonably responded to Plaintiff's claim for the benefits under the Policy. (*Id.* at 17–20). Finally, Defendant argues that Plaintiff is not entitled to Attorney's Fees under O.C.G.A. §13-6-11 because a bad faith insurance claim pursuant to O.C.G.A. § 33-4-6 is the only cause of action for a bad faith denial of insurance benefits. (*Id.* at 20–21).

### A. Breach of Contract

Defendant argues that Plaintiff's breach of contract claim fails as a matter of law on two bases. First, Defendant argues that it properly rescinded the Policy under O.C.G.A. § 33-24-7 because of the decedent's misrepresentations regarding her history of depression on her application. (*Id.* at 9–17). Second, Defendant argues that the Policy was mutually rescinded when Defendant sent Plaintiff premium refund check and Plaintiff cashed it—constituting accord and satisfaction. (*Id.* at 16–17).

#### 1. Misrepresentation

Under Georgia law "[m]isrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under [an insurance] policy or contract unless" the misrepresentation was (1) "[f]raudulent[,]" (2) "[m]aterial either to the acceptance of the risk or to the hazard assumed by the insurer[,]" or (3) "[t]he insurer in good faith would either not have issued the policy or contract or would not have issued a policy or contract in as large an amount or at the premium rate as applied for or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been known to the insurer as required by either the application for the policy or contract or otherwise." O.C.G.A. § 33-24-7. Georgia courts have interpreted material misrepresentations to be ones "that would influence [the] *prudent* insurer in determining whether or not to accept the risk, or in fixing a different amount of premium in the event of such acceptance." *Am Gen. Life Ins. v. Schoenthal Fam., LLC*, 555 F.3d 1331, 1340 (11th Cir. 2009) (quoting *Lively v. S. Heritage Ins.*, 568 S.E.2d 98, 100 (Ga. Ct. App. 2002)). "In cases where the application for insurance is attached to and becomes a part of

9

the policy, in order to avoid the policy for a misrepresentation of the applicant made in the application, the insurer need only show that the representation was false and that it was material in that it changed the nature, extent, or character of the risk." *Davis v. John Hancock Mut. Life Ins.*, 413 S.E.2d 224, 226 (Ga. Ct. App. 1991) (first citing O.C.G.A. § 33-24-7(b); and then quoting *Haugseth v. Cotton States Mut. Ins.*, 386 S.E.2d 725, 726 (Ga. Ct. App. 1989)). Thus, "[i]n determining whether the application contained misrepresentations, omissions, concealment of facts, or incorrect statements sufficient to prevent recovery under the policy, it is immaterial whether [the decedent] acted in good faith in completing the application." *Id.* (citations omitted).

Georgia courts have explained, however, that the rule that insurance contracts are construed against the drafter applies to insurance applications as well:

> The same rule of construing an insurance policy or bond strongly against the insurer and favorably to the insured applies to an application, or matters contained therein, as to the policy itself, the instrument having been prepared by the insurer. The insurance company is also under a duty to frame questions in the application so that they will be free from misleading interpretations. When it has failed to do so, an ambiguity or doubt arises, questions and answers thereto will be construed most favorably to the insured.

*Jackson Nat'l Life Ins. v. Snead*, 499 S.E.2d 173, 177 (Ga. Ct. App. 1998) (quoting 13A Appleman, Ins. Law & Practice, § 7585). Thus, "[i]n construing an insurance [application], the test is not what the insurer intended its words to mean, but what a reasonable person in the position of the insured would understand them to mean." *Harkins v. Progressive Gulf Ins.*, 586 S.E.2d 1, 2 (Ga. Ct. App. 2003) (quoting *Ga. Farm Bureau Mut. Ins. v. Huncke*, 524 S.E.2d 302, 303 (Ga. Ct. App. 1999)). The general rule in Georgia is that "answers to questions in an insurance application that are ambiguous and call for 'yes' or 'no' answers cannot be false as a matter of law." *Snead*, 499 S.E.2d at 177 (quoting *Cockerham v. Pilot Life Ins.*, 374 S.E.2d 174, 176 (N.C. Ct. App. 1998)).

Defendant argues that it properly rescinded the insurance contract under O.C.G.A. § 33-24-7 as a matter of law because decedent made a false statement on her application

10

when she answered "no" to Question 2, which asks, "[h]ave you, within the past 5 years, been treated for or diagnosed by a medical professional with" "Chronic Depression" or a "Mental Disorder." (*See* Doc. 15-3 at 26). According to Defendant, if the decedent had answered "yes" to that question, it would not have provided her insurance. (*See* Doc. 15 at 9). Defendant argues that decedent had a "Mental Disorder" because the decedent's medical records reflect that she was diagnosed with and treated for depression and the Diagnostic and Statistical Manual of Mental Disorders (DSM-V), of which the Defendant asks the Court to take judicial notice, identifies depression as a mental disorder. (*Id.* at 8). Defendant argues that decedent's medical history also reflects a diagnosis and treatment for "chronic depression." (*Id.*). First, Defendant defines "chronic" based on the Merriam Webster definition: "continuing or occurring again and again for a long time." (*Id.* (citing *Chronic*, https://www.merriam-webster.com/dictionary/chronic?src-search-dict-box (last visited Feb. 6, 2025)). Then Defendant argues that Plaintiff was treated for "chronic depression" based on this definition because she had four doctor's visits over the course of three years where she discussed symptoms of depression, was prescribed Zoloft, which was refilled on two occasions, and a doctor determined after a depression screening that she had a "moderate episode of recurrent major depressive disorder." (*Id.*). In response Plaintiff argues that a genuine issue of fact remains regarding whether the decedent made a misrepresentation when she answered Question 2 because the terms "Mental Disorder" and "Chronic Depression" are ambiguous. (Doc. 19 at 11–16).

      Question 2 of the application is an ambiguous question requiring a yes or no answer. *See Snead*, 499 S.E.2d at 177 (finding question "have you smoked cigarettes in the past 12 months" "without emphasizing specifically or delving further into the insurance applicant's status as a smoker" to be ambiguous); *see also Blalock v. Pac. Life Ins.*, No. 5:23-CV-14 (MTT), 2024 WL 3345824, at *7 (M.D. Ga. July 9, 2024) (finding question asking whether applicant had been treated for or diagnosed with "alcoholism" to be ambiguous, in part, because the insurance application did not define "alcoholism"). Question 2 does not define "Mental Disorder" or "Chronic Depression[,]" list examples of mental disorders, or refer the applicant to the Diagnostic and Statistical Manual of Mental Disorders for definitions

11

of these terms. (Doc. 15-3 at 26). Defendant did not define the terms "Chronic Depression" and "Mental Disorder" in the application. (*Id.*). While "Chronic Depression" and "Mental Disorder" may be terms with technical medical definitions outlined in the DSM-V, Defendant cannot now rely on these definitions for purposes of summary judgment when it never provided that information to the decedent in the application. (*Id.*). Thus, a genuine dispute of material fact exists regarding whether Plaintiff made a misrepresentation in the insurance application, and Defendant is not entitled to judgment as a matter of law.

### 2. Accord and Satisfaction

Defendant also argues that it is entitled to summary judgment because "the policy was mutually rescinded based on agreement of the parties, constituting accord and satisfaction." (Doc. 15 at 14–15). "Acceptance by a creditor of a check, draft, or money order marked 'payment in full' or with language of equivalent condition, in an amount less than the total indebtedness, shall not constitute an accord and satisfaction unless:" (1) "[a] bona fide dispute or controversy exists as to the amount due[,]" or (2) "[s]uch payment is made pursuant to an independent agreement between the creditor and debtor that such payment shall satisfy the debt." O.C.G.A. § 13-4-103. "As with any contract, establishment of an accord and satisfaction requires a showing that a meeting of the minds took place[;]" and, "[i]f no agreement exists to settle all matters in dispute, no accord and satisfaction results." *King Indus. Realty, Inc. v. Rich*, 481 S.E.2d 861, 865 (citing *Derosa v. Shiah*, 421 S.E.2d 718, 721 (Ga. Ct. App. 1992)). Furthermore, "a bona fide dispute requires good faith on the part of the debtor who submits a payment in full satisfaction of a claim, even if there is a preexisting dispute between the parties." *Withington v. Valuation Grp., Inc.*, 547 S.E.2d 594, 597 (Ga. Ct. App. 2001). "[A]s a general rule, whether there is [an] accord and satisfaction is a question for the jury." *Id.* (alterations in original) (quoting *Derosa*, 421 S.E.2d at 721).

Defendant argues that it "tendered the premium refund and clearly indicated in its recission letter that it was doing so to effectuate the recission of the policy" and that when Plaintiff cashed the check, he assented to the recission of the policy. (Doc. 15 at 16–17). In response, Plaintiff argues that there was no bona fide dispute regarding the recission of

12

the policy before Defendant tendered the check, so Defendant cannot show accord and satisfaction as a matter of law. (Doc. 19 at 16–20). The following are the undisputed facts regarding this issue. Defendant sent Plaintiff a letter on December 30, 2022, stating the following:

> Medical information from East Albany Medical Center indicates that as well as being unable to work or perform normal activities due to a chronic illness or permanent injury [the decedent] had been treated for recurrent major depressive order prior to the effective date of her contract. Unfortunately, we were not made aware of this on the application and issued coverage believing none of the above-mentioned conditions applied to the insured. Because she answered 'no' to this question on the application, the answer did not accurately reflect her insurability; therefore, death proceeds are not available due to this misrepresentation. A $825.00 refund of all premiums paid is being sent over under separate cover.

(Doc. 15-12). Defendant sent the premium refund check the same day. (Doc. 15-1 ¶ 32; Doc. 19-1 ¶ 32; Doc. 19-7). In the notes written above the check, it says "3AG2 Full/Partial Surrender." (Doc. 19-7). Plaintiff cashed the check. (Doc. 15-1 ¶ 33; Doc. 19-1 ¶ 33).

There is a genuine dispute of material fact as to whether the two documents together—the letter and the check—are marked "with language of equivalent condition" to "payment in full." *See Carpet Transp., Inc. v. TMS Ins. Agency, Inc.*, 302 S.E.2d 421, 422 (Ga. Ct. App. 1983) ("[W]e cannot say as a matter of law that the notation written on the check, 'Ins. premiums to date,' is 'language of equivalent condition' to 'payment in full' under the circumstances of this case." (citations omitted)). Here, the letter notifies Plaintiff that "death proceeds are not available due to [the decedent's alleged] misrepresentation" and that "[a] $825.00 refund of all premiums paid is being sent under separate cover." (Doc. 15-12). The notes on the check say "3AG2 Full/Partial Surrender." (Doc. 19-7). The letter does not state that the insurance company is rescinding or terminating the insurance policy but only that the death proceeds are unavailable. (*See* Doc. 15-12). Furthermore, the check does not state anywhere that Plaintiff would release all claims under the insurance policy or agree to rescind the policy by cashing the check. (*See* Doc. 19-7). The check also

13

does not explain what Plaintiff agrees to "surrender" or specify whether that surrender is "partial" or "full." (*See id.*). Thus, there is a genuine dispute of material fact regarding whether the check and letter were properly marked with language equivalent to "payment in full" under Georgia law. *See Carpet Transp.*, 302 S.E.2d at 422; *see also Rich*, 481 S.E.2d at 865 (determining that there was no accordance and satisfaction based on "acceptance of the reduced checks" where there "no indication appears that the checks were accepted as payment in full").

Even if the Court were to assume that the language in the check and the letter signify payment in full, "[a]cceptance of a check containing mere words of conditional payment 'will not constitute an implied accord and satisfaction unless a dispute as to the correctness of the amount of the debt shall have existed *previously to the tender*.'" *Sunbelt Life Ins. v. Bank of Alapaha*, 337 S.E.2d 410, 413 (Ga. Ct. App. 1985) (citations omitted). Importantly, "[t]he contemplated 'controversy' or 'dispute' is not one which is confined to the mind of the sender of the check, but [it] must be communicated to the recipient other than by the mere employment of words conditional payment appearing on the tendered check." *Id.* In *Sunbelt*, a beneficiary of a life insurance policy made a claim after the death of the insured, and the insurance company "made [the] unilateral decision that [the insured] had . . . committed suicide" and that the beneficiary was not entitled to benefits. *Id.* at 411. The insurance company, therefore, sent a check refunding premiums, which the beneficiary cashed. *Id.* The Georgia Court of Appeals affirmed the denial of the insurance company's motion for summary judgment, determining that there was no showing that a bona fide dispute about the circumstances of the insured's death existed outside the mind of the insurance company when it sent the check. *Id.* at 413. Here too, Defendant "unilaterally" determined that Plaintiff was not entitled to benefits based on its investigation of Plaintiff's claim after the death of the decedent. (*See* Docs. 15-12, 19-7). Defendant then sent the check and letter without a clear explanation of the claims to be released. (Docs. 15-12, 19-7); *see Derosa*, 421 S.E.2d at 721 (genuine dispute of material fact existed as to accord and satisfaction where employee received severance by direct deposit but never "signed any document releasing any claims that he had" and the "separation notice given to appellant .

14

. . [said] nothing about the satisfaction of any other claims" of the employee). As was the case in *Sunbelt*, the Court cannot say that there was an accord and satisfaction as a matter of law.

### B. Bad Faith Claim

Defendant also moves for summary judgment on Plaintiff's bad faith claim under O.C.GA. § 33-4-6, arguing that it, "at the very least[,] had reasonable and probable grounds for not paying the proceeds to Plaintiff" because "the policy was rescinded within the two-year contestability period due to a material representation/omission on the application that wrongfully caused CMFG to issue the policy." (Doc. 15 at 18). O.C.G.A. § 33-4-6 provides in relevant part:

> In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer.

"Bad faith is shown by evidence that under *the terms of the policy* under which the demand is made and under the facts surrounding the response to that demand, the insurer had no 'good cause' for resisting and delaying payment." *Lawyers v. Title Ins. v. Griffin*, 691 S.E.2d 633, 637 (Ga. Ct. App. 2010) (quoting *Ga Int'l Life Ins. v. Harden*, 280 S.E.2d 863 (Ga. Ct. App. 1981)). "It is usually a question for the jury whether an insurance company in refusing to pay a loss acted in bad faith . . . ." *Am. Safety Indem. Co. v. Sto Corp.*, 802 S.E.2d 448, 457 (Ga. Ct. App. 2017) (quoting *Palatine Ins. v. Gilleland*, 52 S.E.2d 537 (Ga. Ct. App. 1949). "If 'it cannot be said as a matter of law that [the insurer's] defense was a reasonable defense which vindicates the good faith of the insurer,' then the insure is not entitled to summary judgment on the issue of bad faith penalties" under O.C.G.A. § 33-4-6. *Id.* at 458 (alteration in original) (first quoting *Sawyer v. Citizens & S. Nat. Bank*, 296 S.E.2d 134, 140 (Ga. Ct. App. 1982); and then citing *Certain Underwriters at Lloyd's*

15

*of London v. Rucker Const., Inc.*, 648 S.E.2d 170, 175 (Ga. Ct. App. 2007)).

Georgia courts have found that where the insurance company "was placed on notice as to the ambiguities [in the insurance policy] and of the rules of contract construction, which dictate that ambiguous insurance-contract language be construed in favor of the insured[,]" it cannot be said as a matter of law that the insurance company had a reasonable defense to a claim. *Auto-Owners Ins. v. Neisler*, 779 S.E.2d 55 (Ga. Ct. App. 2015); *Rucker Const.*, 648 S.E.2d at 176 (affirming trial court's denial of summary judgment as to bad faith claim where claimant put insurer on notice of ambiguities in the contract); *First Fin. Ins. v. Am. Sandblasting Co.*, 477 S.E.2d 390, 392 (Ga. Ct. App. 1996) (affirming award of bad faith penalties where "Plaintiff clearly pointed out to defendant in correspondence that the term 'operations' was capable of more than one interpretation when given a common dictionary meaning" and advised defendant of rules of construction). As discussed above, the terms "Mental Disorder" and "Chronic Depression" in the insurance application are ambiguous. In Plaintiff's demand letter, counsel advised defendant that "chronic depression" is "undefined in [the] Application and Policy, and could be interpreted in multiple ways." (Doc. 15-13 at 3). Counsel also advised Defendant that ambiguous terms in insurance polices are construed in favor of the insured. (*Id.* at 4). Thus, it cannot be said as a matter of law that Defendant has a reasonable defense to the insurance claim.

### C. Attorney's Fees

Defendant moves for summary judgment as to Plaintiff's claims for attorney's fees under O.C.G.A. § 13-6-11 because "the penalties contained in O.C.G.A. § 33-4-6 are the exclusive remedies for an insurer's bad faith refusal to pay insurance proceeds[.]" (Doc. 15 at 20 (quoting *Howell v. S. Heritage Ins.*, 448 S.E.2d 275, 276 (Ga. Ct. App. 1994)). Plaintiff does not respond to this argument. (*See* Doc. 19).

Under O.C.G.A. § 13-6-11, "where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow" attorney's fees and litigation expenses as damages. But O.C.G.A. § 33-4-6 is the exclusive

remedy for an insurer's bad faith denial of insurance benefits. *Atl. Title Ins. v. Aegis Funding Corp.*, 651 S.E.2d 507, 510 (Ga. Ct. App. 2007); *McCall v. Allstate Ins.*, 310 S.E.2d 513, 516 (Ga. 1984); *see also Trade AM Int'l, Inc. v. Cincinnati Ins.*, No. 1:08-CV-3711-ECS, 2012 WL 1865406, at *4 (N.D. Ga. Jan. 18, 2012) ("[A] consistent line of authority . . . confirms that, in an action . . . brought to recover for breach of a first-party [i]nsurance contract and alleging failure to pay a claim of loss, recovery of attorney's fees and expenses must be had under O.C.G.A. § 33-4-6, if at all, and a claim for attorneys' fees and expenses under O.C.G.A. § 13-6-11 is not authorized."). Thus, Plaintiff can only recover attorneys' fees and expenses for Defendant's bad faith refusal to pay under §33-4-6, and Plaintiff cannot recover under §13-16-11 as a matter of law. *See Aegis Funding*, 651 S.E.2d at 510; *see also McCall*, S.E.2d at 516.

## CONCLUSION

Accordingly, Defendant's Motion to Strike (Doc. 22) is **GRANTED**, and Plaintiff's Cross-Motion for Summary Judgment (Doc. 20) is **STRICKEN** as untimely. Plaintiff's Motion in Limine (Doc. 18) is **DENIED**, and Defendant's Motion for Summary Judgment (Doc. 15) is **DENIED in part** and **GRANTED in part**.

**SO ORDERED**, this 31st day of March, 2025.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**